United States v. Ronald Serunjogi Mr. Strike, good morning Good morning, Your Honor Wait a minute, Bill Sir, yes sir Good morning You may proceed Thank you, Your Honor. Good morning, Your Honors. My name is Clifford Strike. I am the representative appellant, Mr. Ronald Serunjogi. Your Honor, we come before this court primarily this morning to argue the sufficiency of the evidence in the conviction of Mr. Serunjogi. The appellant is well aware that in all jury trials or judge-only trials, great deference is given by the jury to the credibility of government's witnesses and, for that matter, defense witnesses. However, there are cases where when an individual's testimony is so damaged internally, either by memory loss, substance abuse issues, lack of recollection, that that testimony eventually has to be discredited because of the huge gaps and contradictions within that individual's testimony. In the case of Mr. Serunjogi, the primary witness against the appellant was Alice May. Alice May indicated to the court, both on direct and during cross-examination, that during the year of 2008, 2009, 2010, that she was seriously involved with drugs, marijuana, what she called shrooms, which are mushrooms, a psychedelic drug, and that her memory as a result of the substance abuse issues was compromised. So the jury knew all these things? Yes, sir. Okay, go ahead. Judge, even though the jury knew these things, the internal inconsistencies of Ms. May's testimonies were such that it simply cannot be taken in belief. I will point out a couple of instances, Your Honor, if I may. First, Ms. Alice May testified before the court that she had never met Mr. Serunjogi, who was the individual that she engaged in the sham marriage with, before October 22, 2008, which was the day of the quote-unquote sham marriage. It is clear from the record, and from both defense evidence and the government's own evidence, that not only did Ms. May know Mr. Serunjogi well prior to October 22, which she denied on multiple occasions, but it is clear from the evidence that she met with and went to the Lewiston City Hall with Mr. Serunjogi on or about August 27 to apply for the marriage license that was used on the 22nd of October. Five days later, despite her denials of the same, she received a Western Union money gram from Mr. Serunjogi, which she later cashed on September 2. She denied any memory of that and any knowledge of that and would not admit to that transaction until confronted with evidence that had been provided to us by the government. She further goes on to indicate that she was given money for this, that that money came from Mr. Senguzi. According to her, it passed through the hands of Mr. Serunjogi. She couldn't even remember how much money was involved. She estimated $800 or $900. I submit to the court that although she testified as to counting said money, she never indicated how much was actually there, nor could she remember. She further testifies, Your Honor, that at some point after the fraudulent marriage had been brought to the attention of the authorities, she was, as we say, wired up. She had a meeting with Mr. Senguzi, wherein Mr. Senguzi spoke to her about the fraud situation, spoke to her about getting a divorce in effort to sustain the sham marriage. And during that conversation, Mr. Senguzi indicated to her, according to her testimony, when he gave her $20 that day, that the money between he and Ms. Ney was his thing and not something that Mr. Serunjogi knew about or was to be part of. This is the government's witness's testimony, Judge. Based on that, it appears, quite frankly, that at best, Mr. Serunjogi's participation in this, if in fact it's called participation, was to pick up Ms. Ney on October 22nd in response to a request by Mr. Senguzi, drove her from Lewiston to Westbrook, and then later in the day, drove her and apparently Mr. Senguzi back to Lewiston after that. That and apparently one meeting that was had between Mr. Senguzi, Ms. Ney, and Mr. Serunjogi occurred on or about, I believe it was June 19th, 2010, immediately prior to an immigration interview between Ms. Ney and Mr. Senguzi. There were no other witnesses to that meeting whatsoever. My client testified on the stand that, in fact, Ms. Ney and Mr. Senguzi appeared at his apartment and asked him to go with them in order to watch the then several months old baby that Ms. Ney had given birth to, which was not Mr. Senguzi's child. Now, there were no witnesses to any of the things that Ms. Ney testified about. There was no confirmation of any money exchanged between her and Mr. Serunjogi. The only confirmation of any money that was exchanged was that money were sent to her on September 1st by Mr. Senguzi. So, if Ms. Ney's testimony is set aside, there's still a fair amount of evidence that the defendant here played a role in arranging this marriage, right? Judge, I would differ with your interpretation of that, sir. There is indication, certainly, that he transported Ms. Ney to the wedding. There is indication that he was with them when they went to the immigration interview. There is also testimony that he helped Mr. Senguzi open up a checking account at the five-city, five-county credit union. There was evidence that he knew the marriage was a fake, apart from Ms. Ney's testimony, right? Yes, Judge. Is there evidence that Ms. Ney was coached by your client? No, Judge. No, there isn't? Well, according to Ms. Ney, there was. My client testified that that's absolutely untrue. We were not able to dispute that because we didn't have any alternative evidence. We didn't have any paperwork or whatnot like we did with some of her other testimony to, in fact, not only dispute it, but to actually show that she was completely mistaken, if not lying. And, in fact, on that marriage certificate, which the government introduced as evidence, at the close of Defense's case, we introduced it by stipulation, the handwriting expert's analysis, that Mr. Serenjogi's signature on that marriage license had been forged. Now, if Mr. Serenjogi was, in fact, going to be part of this conspiracy, it would not make sense, Your Honors, for someone to forge his name on that marriage certificate when he was there on the 22nd of October. So one must think, quite frankly, that if they had to forge Mr. Serenjogi's name on that marriage certificate, it was because he was unwilling to. Is your main point about Ney that without her testimony, there's no proof that the defendant participated in this for profit? So that is, actually, that's true both on the profit issue, but it's also true as far as his actual participation, as far as being a conspirator. Well, I thought you'd agreed with me that there was evidence that he participated in arranging the marriage and that there was evidence, apart from Ney's testimony, that he knew the marriage was a fake. Judge, if I may, the testimony at trial was that, according to Ms. Ney, Mr. Serenjogi called her the day of October 22nd to let her know he was coming to pick her up. Mr. Serenjogi testified that was absolutely not true, that he had been called by Mr. Sanguzzi to go pick up Ms. Ney. Be that as it may, Judge, it appears, quite frankly, that the arrangement had been made between Sanguzzi and Ney, because it would make absolutely no sense whatsoever for Mr. Serenjogi to go to Lewiston to pick up Ms. Ney, to bring her back to Westbrook, if, in fact, the arrangements had not already been made by Mr. Sanguzzi to drive up from Massachusetts dressed for a wedding, as evidenced by the pictures, with others from Massachusetts. I would suggest to the court, this court, that that suggests that it was Mr. Sanguzzi who set up the marriage and not Mr. Serenjogi. Your Honor, mere knowledge of the fact that a marriage is a sham does not mean that he participated as a conspirator in said sham marriage. What about the forged lease? Judge, the forged lease is exactly what it is. It's a forged lease. My client's name is not on it. There's no indication that he helped draft that. The only indication is that it was submitted to the authorities by Mr. Sanguzzi and Ms. Ney, not by Mr. Serenjogi. And that trial, Mr. Serenjogi denied ever giving his lease to Mr. Sanguzzi. And I would point out to the court that Mr. Sanguzzi lived for a period of time at 20 Garfield Street in Saco, where this rental agreement was effectuated. And, in fact, Mr. Serenjogi was renting from King Real Estate at the time. And it is believed, although we cannot prove it, that that lease had been copied from paperwork that had been left out by Mr. Serenjogi. Wasn't there also testimony that it was your client who made the suggestion that the baby stay with him in the car? Judge, that was testimony by Ms. Ney, which my client refuted. My client indicated under oath that he was asked by Mr. Sanguzzi and Ms. Ney to go with them to immigration to watch the baby while they, Mr. Sanguzzi and Ms. Ney, went into the building to deal with the immigration officials. And the reasoning behind that, which I believe came from Ms. Ney, and I would stand to be corrected, was because Sanguzzi and Ney were afraid that bringing in a child that was obviously not Mr. Sanguzzi's and was only a few months old probably would not benefit their attempt to pull the sham marriage off on the government. I'm still trying to figure out what exactly you want us to do with Ms. Ney's testimony, because this is not a situation where there wasn't vigorous cross-examination and the conflicts were not brought out at trial for the jury to evaluate and determine her credibility. You're somehow suggesting that as a matter of law, we should discard her testimony. Well, Judge, I think her testimony was so discredited and so inconsistent that under the United States v. Crenshaw, I think you can do that. I think without her testimony, the bits and pieces that the government had left do not add up to a conspiracy regarding Mr. Sanguzzi. I haven't read the transcript. Maybe you can help me. Yes, sir. Was an instruction given regarding the power of the jury to pick and choose from a testimony of a witness? In other words, they could describe truthfulness as a part of the testimony and otherwise other parts depending on the evidence and how they feel it is substantiated? Judge, quite frankly, I don't remember. You're like Ms. Maiden. Well, yes, sir. In that respect, yes, sir. Okay. All right. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Renee Bunker on behalf of the United States from the District of Maine. Just to start in reverse order, Judge Toye, I don't think the jury instructions were transcribed, but I have yet to see a jury trial in Maine where that credibility instruction was given. Well, it used to happen when I was a district judge, but that doesn't necessarily mean it's done in every case. That wasn't so long ago, apparently, because it still happens now. Well, it was longer, I hate to admit. I'd like to repeat something that Mr. Strike said during closing arguments. We have Alice May on one hand, Mr. Saranjogi on the other hand. One of them is telling the truth. One of them, obviously, is not. And as Judge Toye and Judge Thompson have pointed out, the jury heard not only Ms. May, but also Mr. Saranjogi testify. Was there enough testimony to convict absent May's testimony? Yes, Judge. It would require some circumstantial evidence, and, of course, the jury's verdict necessarily means that they believed May and not Saranjogi. And the standard here, of course, then, is to draw all reasonable inferences from the evidence in favor of that verdict. And I can walk through some of the testimony. I'll highlight independent pieces that wouldn't require May's testimony. But May testified that in the summer of 2008, Saranjogi came by her Lewiston, Maine home, stopped the two talk, exchanged numbers, became friends, and physically intimate. That relationship lasted into 2008. May testified that pretty much every time ---- I don't think there's really a contention that if May's testimony is credited, that there wasn't enough evidence. The contention is that you have to put aside May's testimony because it's inherently incredible. And that seems to be their argument, right? That is their argument. But that is certainly not the standard of review before this Court. And no more than the jury had to set aside Mr. Saranjogi's testimony. And it's the totality of the evidence taken as a whole, which the jury heard. So to be sure, and if I could walk through some of that, and I can highlight there was the ---- I just want to do it somewhat chronologically, but I can jump around a little bit. I wanted to comment on the weddings. After Saranjogi recruited May repeatedly to enter this green card marriage and promised her she would be paid, to be sure, on August 27th, Sengunzi and May got that marriage certificate. And there was certainly May did not recall this apparently rather insignificant event, and having met Sengunzi on that date. But I pointed, I noticed during argument preparation that Sengunzi, Saranjogi himself testified having met his third wife in 2010, but she testified having spent a lot of nights at his house from August 2009 onward. So there's certainly the incredibility around her not having remembered meeting Sengunzi on that one date. It's certainly not significant in the totality of the picture. When defense exhibit after the marriage defense exhibits 1A through 1M evidenced the $400 Western Union payment from Sengunzi to May just as Saranjogi had promised, corroborating May's testimony. Although she didn't remember that payment in particular, she testified that she did recall other Western Union payments. She talked about the Ford truck that Cassandra Linton corroborated and other folks corroborated about the Ford truck. The wedding photos show not only did, regardless of who you believe, Saranjogi appears out of the blue on October 22nd for this wedding. They meet the men in suits in the parking lot. The wedding photos show as May testified. She's dressed in a camouflaged t-shirt, not unaware apparently that this was her wedding day. They go to the notary. There's the fake ring ceremony. There's that photograph of Saranjogi and the notary's wife, I'm sorry, the notary's husband hanging out in the kitchen. He's apparently allowed to attend the wedding dressed in somewhat casual clothes while the men in suits apparently had to wait outside. There was her testimony, of course, about the cash payment that she watched as Saranjogi drove May back to Saranjogi's home. And she watched from the hallways. Sengunzi handed Saranjogi a lot, a lot of money, she testified, $800 to $900 of which, true to Saranjogi's promise, he handed to May. Then the bugging came. She testified about the Saranjogi and Sengunzi bugged her to file that paperwork, sign that I-130 and get the paperwork in for the green card. And there is that, going to Judge Dyke, the independent, there's that June 15, not 19, 15, 2010 interview day, an important day. May testified that Saranjogi and Sengunzi arrived at her home in Lewiston on that morning. The conspirators drove down with her two children and he experienced, as Officer Pelletier testified, Saranjogi had been through this very process with his second wife, Emily. He had been through this interview and to that extent it corroborates somewhat May's testimony that he then coached the co-conspirators on what to say, what to expect, not like a naturalization type of test. He coached them on how to lie to make their marriage appear legitimate when everybody knew it was not. Then the jury heard from Officer Pelletier about the inconsistent statements and another corroborating independent piece of evidence as May testified about Saranjogi. They all agreed that if asked what your favorite television show was, they would say NCIS, NCIS, I do watch it. And Officer Pelletier, noteworthy, testified when he asked Sengunzi, what did you watch Friday night, he said my favorite television show was NCIS. And Officer Pelletier found that remarkable because he hadn't asked that question. But that clearly corroborates May's testimony about what they were talking about on the way down for the trip, and of course Pelletier wasn't there, so that's some rather strong independent corroboration. And then Officer Pelletier, not convinced, he has authority to issue, to grant conditional residency after that interview, and he testified that after meeting with Sengunzi and May independently, he knew he was not going to do so on July 15th. And instead he issued that first notice of intent to deny the NOID, NOID 1 I'll call it, on June 23rd. Independent evidence without May, he sent that NOID to the location of the fake lease, 20 Garfield Street. Sure, a jury could believe the defense that this was a concocted Sengunzi alone fake lease, or the jury could believe that the three conspirators agreed the best address to use would be, perhaps not coincidentally, Saranjogi's 20 Garfield Street residence. Well that's where Officer Pelletier testified, and the evidence showed that NOID went to the United States citizen, it's addressed to May, at Saranjogi's home. Well who responded, according to Officer Pelletier, to that NOID? July 19th, 2010, Saranjogi and Sengunzi respond to the NOID that Pelletier had issued to 20 Garfield Street, to May. And who, according to Officer Pelletier, took the lead? Saranjogi, he was sure, did most of the talking. Saranjogi, Officer Pelletier testified, was the one who handed over the false and misleading documents reporting to support a marriage as legitimate when in fact everyone knew it was not legitimate. And I'm convinced Officer Pelletier, after the Saranjogi and Sengunzi performance at the immigration office, sent the case to criminal investigations. And thereafter, another NOID issued. There was the request for another interview. Basically the gig is up, and then come the texts. Again, independent evidence, although May testified about this, we have the Metro PC records, and in fact photographs of her phone. June 10, 2011, May gets a missed call on her phone. She texts the sender back, and it's Saranjogi's phone that responds. And a jury certainly could have reasonably found that it was Saranjogi who in fact replied. She said, who this? It's me, Ronald. May. Who? Saranjogi. You remember Samson? May. Yeah, I'm busy. Saranjogi. Don't need anything but to let you know if immigrant guys came and asked you if Samson gave you money or a card to marry him. Just say no. No reply for a little while, but apparently Saranjogi, regardless of whether on his own accord or at the prompting of Sengunzi, it's hard to see how that would make a difference as they're conspiring to silence the conspirator that Saranjogi recruited into this sham. 53 minutes later, Saranjogi not having heard back from May. You got my text? Yes. May. Yeah. Saranjogi. Because they have been checking some people if they were paid. And if you say yes, you were put in jail for five years. Again, independent evidence without May and corroborated. Well, much to Saranjogi's chagrin or dismay, May cooperated. And she was not by any means a particularly articulate or intellectual witness. As the district court found at sentencing, she was compromised to begin with. And one could conclude, as the district judge did at sentencing, that's precisely why Mr. Saranjogi chose Ms. May to be Sengunzi's sham bride. But the jury believed her. And we are now here on a standard of review where, in the government's view, there's enough corroborating evidence of May's testimony. And the jury was presented with the explicit choice to believe Mr. Saranjogi or Ms. May. And they made their choice. With that, we ask the court to affirm. Thank you. Thank you.